**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| |
|---|
| PTP ONECLICK, LLC, |
|                  Plaintiff, |
|      v. |
| AVALARA, INC. |
|                 Defendant. |

Civil Action No. 1:18-cv-01671-WCG

**PLAINTIFF PTP ONECLICK, LLC'S**
**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 2

        A.      The Inventors Were The First To Figure Out How To Design A Tax-
                Preparation Program That Could Facilitate Local And Municipal Use
                Taxes. ...................................................................................................... 2

        B.      Mr. Pavlou Files For Patent Protection and The Patent Office Deems The
                Claims Patent Eligible.............................................................................. 3

        C.      Under Protection Of A Confidentiality Agreement, Mr. Pavlou Disclosed
                PTP's Trade Secrets And Other Confidential Information To Avalara.............. 5

        D.      Avalara Misappropriates PTP's Trade Secrets And Breaches The
                Confidentiality Agreement....................................................................... 6

III.    ARGUMENT ....................................................................................................... 7

        A.      The Federal Circuit Has Emphasized That The Step Two Inventive
                Concept Analysis Is Highly Factual. ......................................................... 8

        B.      The Claims Of The '915 Patent Are Directed To Patent-Eligible Subject
                Matter Under Both Of *Alice's* Steps. ...................................................... 11

        C.      PTP's Contributory Infringement Claim. ................................................. 18

        D.      PTP's Trade Secret Misappropriation Claims Are Not Time-Barred And
                PTP Did Not Permit Avalara To Use Its Trade Secrets In Avalara
                Products.................................................................................................. 18

        E.      The WUTSA Is Not Limited To Conduct Occurring In Wisconsin, And
                Even If It Were, The Suit Has A Sufficient Connection To The State. .............. 23

        F.      PTP Properly Pleads Unfair Competition As A Private Cause Of Action
                And The Claim Should Not Be Dismissed. ................................................ 25

        G.      PTP's Breach Of Contract Claim Is Not Time-Barred. ............................ 26

IV.     CONCLUSION.................................................................................................. 29

## **TABLE OF AUTHORITIES**

**Page**

**CASES**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018).......................................................................... passim

*ABB Turbo Systems AG v. TurboUSA, Inc.*,
   774 F.3d 979 (Fed. Cir. 2014)........................................................................20, 21

*Adams Arms, LLC v. Unified Weapon Sys., Inc.*,
   No. 8:16-cv-1503, 2016 WL 5391394 (M.D. Fla. Sep. 27, 2016)..........................22

*Alice Corporation Party Ltd. v. CLS Bank International*,
   134 S. Ct. 2347 (2014).................................................................................... passim

*Allstate Ins. Co. v. Menards, Inc.*,
   285 F.3d 630 (7th Cir. 2002) ...............................................................................26

*Ameritox, Ltd. v. Millennium Health, LLC*,
   No. 13-cv-832, 2015 WL 1915043 (W.D. Wis. Apr. 24, 2015).........................8, 13

*Ancora Technologies, Inc. v. HTC America, Inc.*,
   No. 18-1404, 2018 WL 6005021 (Fed. Cir. Nov. 16, 2018) ..............................7, 15

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*,
   687 F.3d 1266 (Fed. Cir. 2012)..............................................................................8

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)...................................................................... passim

*BSG Tech LLC v. Buyseasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018)..............................................................................16

*Butcher v. United Elec. Coal. Co.*,
   174 F.2d 1003 (7th Cir. 1949) ..............................................................................21

*Cadence Pharm. Inc. v. Exela PharmSci Inc.*,
   780 F.3d 1364 (Fed. Cir. 2015).............................................................................17

*Century Hardware Corp. v. Powernail Co.*,
   282 F. Supp. 223 (E.D. Wis. 1968).......................................................................21

*Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*,
770 F.3d 610 (7th Cir. 2014) ......................................................................18, 19

*Data Engine Technologies. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018)......................................................................13, 15

*ECT International, Inc. v. Zwerlein*,
597 N.W.2d 479 (Wis. Ct. App. 1999) ...............................................................23

*El Pollo Loco, Inc. v. Hashim*,
316 F.3d 1032 (9th Cir. 2003) ............................................................................28

*Emergency One, Inc. v. Waterous Co.*,
23 F. Supp. 2d 959 (E.D. Wis. 1998)..................................................................26

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)............................................................................7

*Faigin v. Doubleday Dell Pub. Grp., Inc.*,
98 F.3d 268 (7th Cir. 1996) ................................................................................27

*Gryczman v. 4500 Pico Partners, Ltd.*,
131 Cal. Rptr. 2d 680 (Cal. Ct. App. 2003).......................................................28

*Hansen v. A.H. Robins, Inc.*,
335 N.W.2d 578 (Wis. 1983) ..............................................................................19

*In re Aftermarket Filters Antitrust Litigation*,
No. 09 C 4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009)...............................26

*Jones v. Int'l Ass'n of Bridge Structural Ornamental and Reinforcing Iron
Workers*,
864 F. Supp. 2d 760 (E.D. Wis. 2012)................................................................18

*Kincheloe v. Farmer*,
214 F.2d 604 (7th Cir. 1954) ..............................................................................21

*Luck v. OTX Acquisition Corp.*,
No. CV 10-1671, 2010 WL 11595817 (C.D. Cal. Aug. 3, 2010)..........................28

*Manistee Apartments, LLC v. City of Chicago*,
844 F.3d 630 (7th Cir. 2016) ................................................................................8

*Marks v. CDW Computer Ctrs., Inc.*,
   122 F.3d 363 (7th Cir. 1997) ................................................................20

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66 (2012) ..............................................................................7

*MCA Records, Inc. v. Allison*,
   No. B199801, 2009 WL 1565037 (Cal. Ct. App. June 5, 2009) (unpublished) ....................28

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011) ..............................................................................8

*Nalco Co. v. Chem-Mod, LLC*,
   883 F.3d 1337 (Fed. Cir. 2018) ............................................................8

*Office Supply Co., Inc. v. Basic/Four Corp.*,
   538 F. Supp. 776 (E.D. Wis. 1982) ......................................................27

*Reusch v. Roob*,
   610 N.W.2d 168 (Wis. Ct. App. 2000) ..........................................25, 26

*Sanchez v. Compania Mexicana de Aviacion S.A.*,
   361 F. App'x 751 (9th Cir. 2010) ........................................................28

*SanDisk Corp. v. Memorex Prod., Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005) ............................................................15

*SAP America, Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ............................................................16

*Studio & Partners, s.r.l. v. KI*,
   No. 06-C-628, 2007 WL 3342597 (E.D. Wis. Nov. 7, 2007) (Griesbach, J.) ........................27

*Vendavo, Inc. v. Price f(x) AG*,
   No. 17-cv-06930, 2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) ..........................................21

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
   887 F.3d 1376 (Fed. Cir. 2018) ............................................................17

## STATUTES

18 U.S.C. § 1836 ("DTSA") .................................................................. passim

18 U.S.C. § 1837 ..................................................................................24

35 U.S.C. § 101 ............................................................................................................. passim

35 U.S.C. § 282 .................................................................................................................... 8

Fla. Stat. § 688.007 ............................................................................................................. 20

Wis. Stat. § 100.20 .............................................................................................................. 25

Wis. Stat. § 134.90 ("WUTSA") ................................................................................... passim

Wis. Stat. § 893.07 .............................................................................................................. 27

Wis. Stat. § 893.51 .............................................................................................................. 19

**OTHER AUTHORITIES**

Cal. Civ. Pro. Code § 337 .................................................................................................... 28

Manual of Patent Examining Procedure § 1207.03 ............................................................. 18

Fed. R. Civ. P. 12(b)(6) ................................................................................................. passim

U.S. Patent 9,760,915 .................................................................................................... passim

## I.      INTRODUCTION

Under the guise of negotiations to acquire a small business, Avalara, Inc., a company with offices around the country and world, stole PTP OneClick, LLC's most valuable intellectual property—the trade secrets underlying PTP's innovative tax preparation product.  Avalara then incorporated PTP's proprietary technology into its own products, unfairly competing with PTP and infringing PTP's patent.

Avalara now seeks to dismiss this lawsuit, which was necessitated by Avalara's improper behavior.  Avalara boldly asks the Court to find, by clear and convincing evidence, that PTP's patent is invalid, despite a three-judge panel at the U.S. Patent Office having found the patent to be valid over the very same argument.  And, Avalara asks the Court to do so pursuant to Rule 12(b)(6), under which the Court must credit PTP's well-pleaded allegations as true, and in view of the Federal Circuit's direction (uncited by Avalara) that such an analysis is dependent upon fact questions about what was well known at the time PTP applied for the patent.  In support of its position, Avalara offers no evidence, just non-specific accusations, inapplicable analogies, and clichés such as the certainty of death and taxes.

Avalara's arguments to dismiss PTP's trade secret claims likewise ask the Court to pursue highly factual analyses, not suited for the pleadings phase, about PTP's reasonable diligence in uncovering Avalara's transgressions and whether PTP dedicated its trade secrets to Avalara by agreement, which PTP certainly did not.  Avalara also argues against, but does not cite, Wisconsin appellate law that parties have a private cause of action under Wisconsin's unfair competition law.

As discussed below, the Complaint as pleaded supports PTP's causes of action and Avalara offers no adequate bases for dismissing the Complaint under Rule 12(b)(6).

## II.    BACKGROUND

### A.    The Inventors Were The First To Figure Out How To Design A Tax-Preparation Program That Could Facilitate Local And Municipal Use Taxes.

In most states, the same transaction can be taxed by various taxing authorities, all with their own types of taxes.  The whole system is very complicated.  The same business may be taxed differently depending on the items sold, and otherwise-identical businesses can be taxed differently based on what side of a street they are on.  In the early 2000s, because of these and other complications, determining the appropriate taxing authorities, tax rates, permissible deductions, and the proper tax return forms could take seemingly endless hours of diligence and research, even by experts.  Then, it could take hours more to prepare the tax forms—which were not always readily available, and sometimes did not exist.  ECF No. 1, Compl. ¶¶ 10-11.  The whole process was so complicated that there were often mistakes—omitted taxes or omitted deductions—and these mistakes were costly.  *Id.* at ¶ 11.  Tax authorities could impose penalties or interest, and they would sometimes even seize property.  *Id.*

Despite the great need, the problem was proving to be intractable.  Compl. Ex. 3 at 1:43-45.  For example, the defendant here, Avalara, Inc., was selling tax-preparation programs, but its products could not allow a user to accurately or comprehensively calculate multi-level local sales and use tax or prepare the appropriate tax returns.  Compl. ¶¶ 15, 33.  Avalara was actively trying to find someone that could.  *Id.* at ¶ 23.

Circa 2005, Messrs. Pavlos T. Pavlou and Nicholas M. Mavros cracked the code.  *Id.* at ¶ 13.  They invented a way to automatically calculate, prepare and file local taxes.  As part of his effort to market the invention, Mr. Pavlou started PTP OneClick, LLC ("PTP"), a company that commercialized the invention as Pavlou SalesTaxPRO.  *Id.* at ¶ 13.

**B.    Mr. Pavlou Files For Patent Protection and The Patent Office Deems The Claims Patent Eligible.**

In 2006, Messrs. Pavlou and Mavros filed a provisional application describing their invention, and the next year they filed a patent application that ultimately issued as U.S. Patent 9,760,915. Compl. Ex 3. The patent describes a system and method for automatically preparing state and local sales and use taxes. Compl. Ex. 3 at abstract. The patent describes the problems with the prior art. *Id.* at 1:31-60. Very few programs existed at the time that could prepare any kinds of taxes, and none could prepare local municipal taxes. *Id.* at 1:41-45. As a result, the patent explains, accountants and business owners were forced to manually prepare local taxes, which was cumbersome and often led to returns that were riddled with errors. *Id.* at 1:48-55.

The '915 patent solved the problem. It describes and claims its total solution for sales and use taxes. *Id.* at 1:67-2:8. The patented system allows users to prepare and file returns with the proper taxing authority. *Id.* at 3:11-13. The specification includes more than a hundred figures diagramming the invention, including dozens of figures explaining how to use the described "database" (or "DB") to achieve the claimed invention.

For this case, parts of the prosecution history—the back and forth between the applicants and the U.S. Patent and Trademark Office ("Patent Office")—are particularly relevant and are summarized below. On May 24, 2013, the examiner rejected the claims believing that they were "directed toward . . . an abstract idea." Declaration of Collin J. Kurtenbach (hereinafter "Kurtenbach Decl.") ¶ 2, Ex. 1 at 2. (The office action begins with claim 2, as claim 1 had been previously cancelled. The claims were ultimately renumbered when the patent issued.) The applicants tried to convince the examiner that the claims are directed to a "specific application of automatically preparing tax returns," but to no avail. Kurtenbach Decl. ¶ 3, Ex. 2 at 8.

The applicants therefore appealed to the Patent Office's Patent Trial and Appeal Board. As they explained, the "claimed invention is not an abstract idea but instead provides a particular technological solution to an unmet problem and therefore is a computer-implemented invention that is eligible for patent protection."  Kurtenbach Decl. ¶ 4, Ex. 3 at 7.  They explained that this was much more than the "age-old idea of tax preparation" because the claims require specific computer-implemented interactions, including automatically determining by a computer "a plurality of taxing authorities associated with a location and transaction" and  "multi-level tax rates associated with the taxing authorities"; automatically calculating the "tax amounts"; automatically determining the "multi-level tax return information," and "transmitting" that information to the computer systems associated with a tax authority.  *Id.* at 8-9.  The combination of these computer-based steps "are integral to the performance of the claimed method and system" and are not just abstract.  *Id.* at 10.  The applicants therefore explained that the claims are not directed to an abstract idea, and, in any event, the claims include inventive features.  *Id.* at 11.  The examiner answered, reiterating his belief that the claims were not patent eligible.  Kurtenbach Decl. ¶ 5, Ex. 4 at 2.

On March 1, 2017, a three-judge panel of the Board reversed the examiner.  For the patent-eligibility question, the Board applied the two-part test set out in *Alice Corporation Party Ltd. v. CLS Bank International*, 134 S. Ct. 2347, 2355 (2014).  Kurtenbach Decl. ¶ 6, Ex. 5 at 3-4.  Applying the two-step test of *Alice*, it concluded that the claims were not directed to an abstract idea and, separately, that the claims contain sufficient limitations to "transform the claim."  *Id.*

On September 12, 2017, the Patent Office issued the '915 patent with two independent claims.  Claim 1 recites:

> 1. A computer-implemented method of automatically preparing tax returns of a taxable entity comprising:

receiving by a computer tax information associated with the taxable entity, wherein the tax information includes information regarding a location and a transaction associated with the taxable entity;

automatically determining by the computer a plurality of taxing authorities associated with the location and the transaction;

automatically determining by the computer multi-level tax rates associated with the plurality of taxing authorities based on the received tax information;

automatically calculating by the computer one or more tax amounts based on the received tax information and the multi-level tax rates;

automatically determining by the computer multi-level tax return information based on the received tax information and the one or more calculated tax amounts; and

transmitting over a computer network the multi-level tax return information to a computer system associated with one of the plurality of taxing authorities associated with the multi-level tax return information.

The second independent claim, which issued as claim 12, is to a system for preparing returns, which depends on the "database" described above.

### C.   Under Protection Of A Confidentiality Agreement, Mr. Pavlou Disclosed PTP's Trade Secrets And Other Confidential Information To Avalara.

In 2011, Avalara and PTP discussed joining forces. Compl. ¶ 14. On August 1, 2011 the parties executed a Confidentiality Agreement to protect PTP's information during the discussions, which began on August 2 in Avalara's offices. *Id.* at ¶ 17; Compl. Ex. 2. During the meeting, Avalara's executives admitted that their own tax programs could not automatically calculate state and multi-level local sales taxes. Compl. ¶ 19. Instead, people would have to prepare those taxes manually, and it would take hours. *Id.* When Mr. Pavlou demonstrated SalesTaxPRO's capabilities, Avalara's executives were impressed. *Id.* at ¶¶ 19, 21. After Mr. Pavlou's first demonstration, the Avalara executives asked Mr. Pavlou to repeat it twice more for additional attendees who were called into the room or joined by phone. *Id.* at ¶ 21. The Avalara team asked Mr. Pavlou to explain his program, which he did, on a whiteboard while the Avalara

representatives took notes.  *Id.* at ¶ 22.  Among other things, Mr. Pavlou disclosed the underlying functionality of Pavlou SalesTaxPRO, including PTP's trade secret methods and algorithms for automatically determining the appropriate taxing authorities and applicable tax rates.  *Id.*  After the meeting, Mr. Pavlou mailed Avalara an unlocked copy of Pavlou SalesTaxPRO and provided additional confidential materials in response to follow-up questions about PTP's plans for geographic and product growth.  *Id.* at ¶¶ 24-25.  Several months later, Avalara told PTP that Avalara was no longer interested in a deal.  *Id.* at ¶ 26.

> **D.    Avalara Misappropriates PTP's Trade Secrets And Breaches The Confidentiality Agreement.**

Prior to the 2011 information exchange, Avalara did not have a product that could automatically identify and apply certain kinds of local taxing authorities and their tax rates.  *Id.* at ¶ 33.  Following the 2011 discussions, unknown to PTP, Avalara released a series of products and revisions that enabled Avalara to support state and local tax return requirements of its customers, and enabled automatic determination and application of local taxing authorities.  *Id.* at ¶ 34.  This was the very functionality that Mr. Pavlou disclosed to Avalara in 2011, under the protection of the Confidentiality Agreement.  *Id.*  Having signed a Confidentiality Agreement requiring Avalara to destroy or return PTP's confidential information, Mr. Pavlou had no reason to investigate Avalara's products after Avalara became disinterested in buying PTP.  *Id.* at ¶ 26.  To his surprise, in 2017 an investor contacted Mr. Pavlou and informed him that Avalara's products appeared to contain similar functionality to PTP OneClick's product.  Compl. ¶ 43.  Mr. Pavlou investigated and verified that Avalara's then-current and prior products back to 2012, contained such functionality.  Avalara sells its infringing products throughout the United States, including in Wisconsin.  *Id.* at ¶ 53.

## III.   ARGUMENT

In *Alice Corp. Party Ltd. V. CLS Bank Int'l*, the Supreme Court articulated a two-step framework for determining patent eligibility under 35 U.S.C. § 101.  Step One asks whether the claims are directed to one of the judicially-created exceptions to patentable subject matter, namely "[l]aws of nature, natural phenomena, and abstract ideas."  134 S. Ct. at 2354-55.  If the claims are not directed to one of the exceptions, the *Alice* analysis ends.  If they are directed to an exception, the analysis proceeds to Step Two, which analyzes whether the claims add an "inventive concept" sufficient to "transform" the claim into "something more."  *Id.* at 2354 (citations omitted).

In deciding whether a claim is directed to a judicial exception under Step One, courts should "tread carefully," lest the principle "swallow all of patent law." *Id.*; *see Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) ("too broad an interpretation of this exclusionary principle could eviscerate patent law").  "At some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 566 U.S. at 71).  "'[S]oftware can make non-abstract improvements to computer technology.'"  *Ancora Technologies, Inc. v. HTC America, Inc.*, No. 18-1404, 2018 WL 6005021, at *3 (Fed. Cir. Nov. 16, 2018) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)).  In deciding what kinds of software are not abstract, relevant considerations include whether the patent provides a "specific improvement" and "departs from earlier approaches," whether the patent provides "specific structure," and whether the claims are "specific and limited" and recite a "specific technique." *Id.* at *4 (citing cases).

"The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (citations omitted).  "The question of whether a claim element or combination of elements is well-understood, routine and

conventional to a skilled artisan in the relevant field is a question of fact." *Id.* at 1368. When ruling on a motion to dismiss, the Court should "'assume[] all well-pleaded allegations are true and draw[] all reasonable inferences in the light most favorable to the plaintiff.'" *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1347 (Fed. Cir. 2018) (quoting *Manistee Apartments, LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016)). Accordingly, "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126-27 (Fed. Cir. 2018).

Because issued patents are "presumed valid," defendants arguing that a patent is invalid must prove their case by "clear and convincing evidence." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) (quoting 35 U.S.C. § 282). Thus, a party arguing that a patent claims ineligible subject matter must "demonstrate through clear and convincing evidence that the patent is invalid under § 101." *Ameritox, Ltd. v. Millennium Health, LLC*, No. 13-cv-832, 2015 WL 1915043, at *1 (W.D. Wis. Apr. 24, 2015); *see Berkheimer*, 881 F.3d at 1368. It "will ordinarily be desirable— and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012).

A.   **The Federal Circuit Has Emphasized That The Step Two Inventive Concept Analysis Is Highly Factual.**

Two 2018 Federal Circuit decisions underscore the highly factual nature of the "inventive-concept" analysis. In both, the Federal Circuit reversed district courts that prematurely deemed an invention ineligible for patenting. Avalara cites neither case.

1.      *Berkheimer v. HP Inc.*

In *Berkheimer*, the district court ruled at summary judgment that Berkheimer's claims to methods of archiving items in a computer were not patent eligible.  *See Berkheimer*, 881 F.3d at 1362, 1366.  The district court found that the claims were directed to an abstract idea and that they did not contain a separate inventive concept.  *See id.* at 1362, 1368.  The Federal Circuit agreed that the claims were directed to an abstract idea, but it ruled that it was premature to find that there was no inventive concept.  *Id.* at 1367-69.  For summary judgment purposes, the Federal Circuit accepted as true "that the claimed combination improves computer functionality . . . which provides inventive concepts."  *Id.* at 1369.  It therefore ruled that it was improper to invalidate by summary judgment the claims that "contain limitations directed to the arguably unconventional inventive concept described in the specification."  *Id.* at 1370.

2.      *Aatrix Software, Inc. v. Green Shades Software, Inc.*

The next week, the Federal Circuit issued another important eligibility case.  In *Aatrix*, the defendant moved to dismiss Aatrix's patent-infringement claims arguing that they were ineligible for patent protection.  882 F.3d at 1123.  The claims were directed to "systems and methods for designing, creating, and importing data into a viewable form on a computer so that a user can manipulate the form data and create viewable forms and reports."  *Id.*  The district court dismissed the case, finding that all the claims were not patent eligible.  *Id.* at 1124.  For most claims, the district court applied the two-step *Alice* analysis and concluded that the claims were directed to an abstract idea under Step One.  In support, the district court found that the claimed calculations "can be performed using a pen and paper."  Under Step Two, the court separately found that the claims contained no "inventive concept."  *Id.*  Aatrix sought leave to amend the complaint to include supplemental allegations and evidence, but the district court denied the motion.  *Id.*

The Federal Circuit reversed, rejecting the defendant's arguments that any amendment

9

would have been futile.  The court explained that patent eligibility can involve "fact questions," and "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)."  *Id.* at 1126-27, 1128.  Aatrix had done so.  The Federal Circuit focused on Aatrix's allegations about "the problems present in prior art" and the patented solutions of those problems, namely Aatrix's allegations that: (1) "'[t]he inventions of the Aatrix Patents allowed data to be imported from an end user application . . . without having to custom program the form files to work with each outside application'"; (2) the inventions "'eliminated the need for hand typing in the values [thus] eliminating the risk of transcription error'"; and (3) the "'invention increased the efficiencies of computers processing tax forms.'"  *Id.* at 1127 (quoting the amended complaint).  Given that the case was at the Rule 12(b)(6) stage, the Federal Circuit credited the allegations and concluded that the inventions were drawn to patentable "improvements in the functioning and operation of the computer."  *Id.* at 1127-28 (citing numerous cases).  It therefore reversed.

> **3.    The Patent Office's *Berkheimer* Memo Provides Guidance That Whether Subject Matter Was Well-Understood, Routine Or Conventional Activity (Step Two) Is A Question Of Fact Which Must Be Shown By Specific Evidence.**

The significance of *Aatrix* and *Berkheimer* was immediately apparent.  The Patent Office promptly issued a memorandum titled:  "Changes in Examination Procedure Pertaining to Subject Matter Eligibility, Recent Subject Matter Eligibility Decision (*Berkheimer v. HP, Inc.*)" (the "*Berkheimer* memo"), addressing the impact of both decisions.  See https://www.uspto.gov/sites/default/files/documents/memo-berkheimer-20180419.PDF, Kurtenbach Decl. ¶ 7, Ex. 6.  The *Berkheimer* memo emphasizes that the question of what was "well-understood, routine, and conventional" is a "factual determination."  *Id.* at 2.  Examiners may conclude "that an element (or combination of elements) represents well-understood, routine, conventional activity only when

the examiner can readily conclude that the element(s) is widely prevalent or in common use in the relevant industry." *Id.* at 3 (emphasis in original).  The examiner must support this with specific evidence that an element was "well-understood, routine, [or] conventional"—it is not enough to just show that something was known in the prior art. *Id.* at 4.

> **B.     The Claims Of The '915 Patent Are Directed To Patent-Eligible Subject Matter Under Both Of *Alice's* Steps.**

The Patent Office's Patent Trial and Appeal Board has considered the exact issue raised by Avalara.  The Board applied the *Alice* test and properly concluded that the claims of the '915 patent are directed to patent-eligible subject matter and should not be rejected under Section 101.  This Court should give deference to the Board's decision, especially at the Rule 12(b)(6) stage, given *Aatrix* and *Berkheimer*'s recognition that patent eligibility can depend on underlying factual questions.  Here, the Court should find that Avalara has not proved that PTP's patent claims are abstract under *Alice* Step One.  And, even if the Court finds that Avalara has met its burden to prove Step One, the Court should find that Avalara has not proved, by specific, clear and convincing evidence, and under Rule 12(b)(6) review requirements, that the claims were well-understood, routine, or conventional activity under *Alice* Step Two.

> **1.     Independent Claim 1.**

Avalara argues that the steps recited in claim 1 can be abstracted to "nothing more than the addition of a computer into the mundane process of preparing and filing a business tax return: identifying a transaction, determining the tax rates applicable to that transaction depending on the location (e.g., city, state, etc.), calculating the tax, and preparing and filing returns [with] the government."  Memorandum In Support of Defendant's Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6), ECF No. 9, (hereinafter "Memo.") at 9.  Avalara asserts that it is fatal that "generations of citizens" have filed business tax returns.  *Id.*  It then argues that there is no

inventive concept because all the specific steps are "generic" and the "claims use the computer, database, and network as tools to do what humans had done with pencil and paper for generations." *Id.* at 11, 13.

Avalara's abstractions and generalizations are exactly the kind of unsupported arguments that *Berkheimer*, *Aatrix* and the Patent Office's corresponding memo warns are insufficient.  While people certainly have been paying taxes for years, back in 2006 (the relevant date for determining patent eligibility) only a few companies had developed any form of a computerized system for filing sales and use taxes, and no one had figured out how to prepare local sales and use taxes automatically by computer.  *See* Compl. Ex. 3 at 1:41-60.  The local sales and use taxes had to be determined manually, and, as a result, "local municipal taxing authorities [we]re often not included in other tax returns because of the cumbersome nature and thus expense of determining such deductions."  *Id.* at 1:52-54.  That is, tax preparers often erred in preparing such taxes, even after spending an inordinate amount of time preparing them.

The '915 patent invention increased efficiency and decreased mistakes in state and local sales and use tax preparation.  *Id.* at 1:45-55.  The inventors realized that if they collected tax information that included the location of transactions, they could automatically determine the plurality of tax authorities that were associated with the transaction; with that information in hand, they could automatically determine the relevant multi-level tax rates; with which they could automatically calculate the tax amounts and determine the tax information; which ultimately allowed them to electronically transmit the tax return information to the relevant authorities.  *Id.* at 3:7-16.  They then designed a computerized system to do this.  *Id.*  Using the patented system, local taxes were properly calculated, and quickly at that, which, among other things, allowed users to properly deduct their local taxes in other tax returns.  *Id.* at 1:51-60.  The claims are not directed to an abstract idea, and, furthermore, they recite an inventive concept.

      **(a)**      ***Alice* Step One:  The '915 Patent Claims Are Not Abstract.**

Claims are not abstract just because they are directed to methods for using a computer to achieve a goal.  For example, in *Data Engine Technologies. LLC v. Google LLC*, the Federal Circuit found that a claim to "a computer-implemented method of representing a three-dimensional spreadsheet on a screen display" was patent eligible under *Alice* Step One.  *Data Engine*, 906 F.3d 999, 1005, 1007 (Fed. Cir. 2018).  The Federal Circuit focused on the fact that the patent "provides a specific solution to then-existing technological problems in computers."  *Id.* at 1008.  Specifically, the patent "provid[ed] a highly intuitive, user-friendly interface with familiar notebook tabs for navigating the three-dimensional worksheet environment."  *Id.*  The Federal Circuit emphasized that "[t]he invention was applauded by the industry."  *Id.*

That is true here.  The claims of the '915 patent recite a specific solution to the then-existing technological problem of how to automatically prepare tax returns, and the invention was applauded by the industry.  Avalara's own "Executives were impressed" to the point where they explained that they wanted to "build [their] company" around the invention.  Compl. ¶ 23.

      **(b)**      ***Alice* Step Two:  The '915 Patent Claims Were Not And Are Not Well-Understood, Routine Or Conventional Activity.**

In any event, the inventors here certainly claimed an inventive step.  Many of the claimed steps were not routine or conventional, and certainly the combination was not.  Avalara has not proved otherwise.  It has introduced no meaningful evidence to the contrary, despite having the burden of proof, and in view of PTP's pleaded allegations.  *See, e.g.*, *Berkheimer*, 881 F.3d at 1367; *Ameritox*, 2015 WL 1915043, at *1.  Avalara does not refute that PTP's Complaint and attached patent describe an inventive concept, which statements must be credited as true under Rule 12(b)(6).  Rather, Avalara makes unspecific, general statements.  For example, Avalara points to the certainty of "death and taxes" and the patent's statement that people tried to correctly pay

taxes before.  Memo. at 17 n.5.  The claims are not directed to just any method of paying taxes, so this platitude is irrelevant.

Aatrix is illuminating.  There, the district court did just what Avalara asks this Court to do: It ruled that claims directed to collecting, organizing, and performing calculations on data to fill out forms were not patent eligible because those steps were "a fundamental human activity that can be performed using a pen and paper."  882 F.3d at 1124.  The Federal Circuit reversed because the way the steps were performed included an "inventive concept."  *Id.* at 1126.  As the Federal Circuit explained, the district court should have considered the alleged "problems present in prior art" and the alleged "improvements and problems, solved by the [patentee's] patented inventions."  *Id.* at 1127.  *Aatrix* also emphasized the patented invention's ability to import data "without having to custom program the form files to work with each outside application"; the ability to "eliminat[e] the need for hand typing in the values and eliminating the risk of transcription error"; and "increas[ing] the efficiencies of computers processing tax forms."  *Id.*

All that is true here—down to the "efficiencies in computers processing tax forms."  *See id.*  The Complaint alleges that, as of the filing date of the '915 patent, "no comprehensive solution for the calculation, preparation, and filing of state and local sales and use taxes existed."  Compl. ¶ 9.  A "tax preparer [had] to perform many hours of diligence and research" for each customer just to get situated, and s/he then had to "spend additional time performing and recording the necessary calculations and filling out the required tax forms."  *Id.* at ¶ 11.  This was both "cumbersome[,] time-consuming," and risked "omit[ting] permissible deductions or applicable taxes," which "could result in severe monetary penalties."  *Id.*  The inventors solved this in a "technically innovative" manner, as Avalara's own executives recognized.  *Id.* at ¶¶ 12, 19.  The inventors of the '915 patent, like those in *Aatrix*, "adequately allege[d] their claims contain inventive concepts," so they "survive a § 101 eligibility analysis under Rule 12(b)(6)."  *Aatrix*,

882 F.3d at 1126-27.  *Berkheimer* is equally on point.  For the same reasons discussed above, the claims of the '915 patent "improves computer functionality . . .  which provides inventive concepts."  *Berkheimer*, 881 F.3d at 1369.

### 2.    Independent Claim 12.

For many of the same reasons as Claim 1, Claim 12 is also patent eligible.  However, claim 12's "database" limitation, properly construed, is a separate reason that the claim is patent eligible.  Because there has not been a "full development of the record or issues," it is premature for PTP to propound a final construction of "database."  *See SanDisk Corp. v. Memorex Prod., Inc.*, 415 F.3d 1278, 1291 (Fed. Cir. 2005).  Nevertheless, PTP notes that the '915 patent provides significant structure for "databases."  Compl. Ex. 3 at 11:1-12:3.  The patent begins by providing extensive schematics for the recited "database."  *See* Compl. Ex. 3 at Figs. 2A-N, 3A-M, 4, 4A, 2:20-26.  It goes on to explain that "the user database **28** is populated by the user and includes various data that is input by the user including but not limited to receipts, deductions and purchases as well as data regarding the business entity involved and the preparer."  *Id.* at 11:57-61.  "The server database **32** includes various information relating to registration and licensing of the system."  *Id.* at 11:66-12:1.

The "database" term is an additional reason the claim is patent eligible under both steps of *Alice*.  As relates to Step One, the Federal Circuit has explained that a claim to a "'specific structure . . . that performs a specific function'" is "'not directed to an abstract idea.'"  *Ancora*, 2018 WL 6005021, at *4 (quoting *Data Engine*, 906 F.3d at 1010-11).  The database, construed in light of the specification, provides just such a specific structure.  It includes specific information organized in a specific way.

The term is equally relevant in assessing Step Two.  As the Federal Circuit noted in *Aatrix*, one of the district court's reversible errors was the district court's failure to properly consider the

claim term "data file."  882 F.3d at 1125.  The Federal Circuit explained that the district court should have credited the patentee's allegation "that the claimed data file contains an inventive concept" sufficient for patent eligibility.  *Id.* at 1129.  "In light of the[se] allegations . . . the district court could not conclude at the Rule 12(b)(6) stage that the claimed elements were well-understood, routine, or conventional."  *Id.*

Claim 12's "database for storing tax information" is analogous to *Aatrix*'s "data file," and Avalara's request that this Court find that "'database'" is a "generic element[]," Memo. at 9, 14, is precluded by *Aatrix*.  Just as with *Aatrix*'s "data file," there is at least a factual dispute whether the claimed database "is a well understood and routine component and function of a computer." *Aatrix*, 882 F.3d at 1129.  "In light of the allegations made by [the patentee], the district court could not conclude at the Rule 12(b)(6) stage that the claimed elements were well-understood, routine, or conventional."  *Id.*

Avalara cites *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018), and *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018), for the proposition that a "database" is a "generic component."  Memo. at 12.  In both cases, the Federal Circuit went out of its way to emphasize the narrowness of its holdings:  Those specific records showed that the databases recited in those claims were clearly generic.  In *SAP*, it was "clear, from the claims themselves and the specification, that these limitations require no improved computer resources [the patentee] claims to have invented, just already available computers, with their already available basic functions."  *SAP*, 898 F.3d at 1169-70.  Likewise, the *BSG* patent "makes clear" that the claimed databases "were commonly used at the time of invention. *BSG*, 899 F.3d at 1286-87.  By contrast, the '915 patent provides 29 figures diagramming the specifics of how to make the types of databases claimed.  That is not the "already available" functions described in *SAP* or the "commonly used" databases of *BSG*.

*Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376 (Fed. Cir. 2018), cited by Avalara, Memo. at 12-13, is even further removed, as it does not involve a database at all.  And the "standard personal computer" discussed in that case was just that: standard.  *Id.* at 1386.  Not surprisingly, in *Voter Verified*, "[n]either party dispute[d]" that the standard personal computer and other devices (a visual-display device and a keyboard) were "standard components."  *Id.*

### 3. The Dependent Claims.

Avalara does not dispute that if claims 1 and 12 are patent eligible, all the dependent claims are as well.

### 4. The Expert Board's Determination That The Claims Are Patent Eligible Merits Respect.

Where the Patent Office "initially rejected the claims . . . for essentially the same reasons as defendants now raise, the Patent Office is presumed to have properly done its job when it ultimately allowed the . . . patent."  *Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1375 (Fed. Cir. 2015) (citations omitted).  As Avalara recognizes, the examiner initially rejected the claims as not directed to patent-eligible subject matter.  PTP appealed that decision to the Patent Office's Patent Trial and Appeals Board, which considers appeals from examiners decisions during patent prosecution.  The Board took up the appeal and a three-judge appellate panel considered whether the patent claims were eligible patent subject matter under 35 U.S.C. § 101. After performing its review and analysis, the Board found the claims to be patent eligible under Section 101 and reversed the examiner.

Avalara asks this Court to ignore the Board's decision, claiming that "[t]he BPAI's [*sic*] reversal was grounded in the Examiner's failure to support the rejection rather than an independent evaluation of the merits under Section 101."  Memo. at 15.  Avalara ignores the Board's role.  The Board is not an automaton that looks only at the way the examiner frames an issue.  It looks at "the

basic thrust of the rejection" and "the evidence relied upon in support of the rejection."  Manual

of Patent Examining Procedure §§ 1207.03(III); 1207.03(a)(II).  And the Board did just that here.

There can be no dispute that the appellate board's three-judge panel was required to and did

independently review the patentability of the claims of the '915 patent, and founds the claims to

be patentable.  Just as the Board found the claims to be patent eligible, this Court should too—

even more so at the Rule 12(b)(6) stage and given Avalara's clear and convincing burden of proof.

> ### C.     PTP's Contributory Infringement Claim.

While it challenges the validity of the '915 patent, Avalara does not dispute that PTP has

pleaded proper claims for direct and induced patent infringement.  Avalara does, however, take

issue with PTP's count for contributory infringement, arguing that PTP has not made the specific

allegation that the accused products have no substantial non-infringing uses.  Memo. at 18.  PTP

has not so alleged, due to the lack of public accessibility to Avalara's products, which to PTP's

understanding cannot be purchased without registering with Avalara.  Should the Court find PTP's

contributory infringement count to be deficient on this basis, PTP would seek leave to re-plead the

claim in the future if discovery in this matter provides sufficient basis to allege no substantial non-

infringing uses.

> ### D.     PTP's Trade Secret Misappropriation Claims Are Not Time-Barred And PTP
> ###        Did Not Permit Avalara To Use Its Trade Secrets In Avalara Products.

Avalara challenges PTP's trade secret misappropriation counts as time barred or forfeited

under the Confidentiality Agreement.  Not so.  Despite Avalara's suggestion to the contrary,

Memo. at 19, the Seventh Circuit recognizes that  "when a defendant charges noncompliance with

the statute of limitations, dismissal under Rule 12(b)(6) [is] irregular, for the statute of limitations

is an affirmative defense."  *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610,

613 (7th Cir. 2014) (internal quotation omitted); *see also Jones v. Int'l Ass'n of Bridge Structural*

*Ornamental and Reinforcing Iron Workers*, 864 F. Supp. 2d 760, 767 (E.D. Wis. 2012). "[A] motion to dismiss based on failure to comply with the statute of limitations should be granted only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Chicago Bldg. Design*, 770 F.3d at 613-14 (internal quotation omitted).

Here, Avalara does not identify allegations in the Complaint sufficient to satisfy a statute of limitations affirmative defense. Nor did PTP, as Avalara also argues, grant Avalara permission to use PTP's trade secrets after three years.

> **1.  The Statute Of Limitations For Trade Secret Misappropriation Does Not Begin To Run Until The Owner Is Aware Or Should Have Been Aware Of The Misappropriation.**

As a general matter, Wisconsin recognizes that it is unjust for the "statute of limitations to begin to run before a claimant could reasonably become aware of the injury." *Hansen v. A.H. Robins, Inc.*, 335 N.W.2d 578, 582 (Wis. 1983) (in the personal injury context). This often is referred to as the "discovery rule," and it is a highly factual inquiry that applies equally to PTP's claims under the Wisconsin Uniform Trade Secrets Act ("WUTSA") and the Defend Trade Secrets Act ("DTSA"). *See* Wis. Stat. § 893.51(2); 18 U.S.C. § 1836(d).

PTP's Complaint pleads facts that satisfy the discovery rule. Avalara has not proven otherwise. The Complaint describes in detail the nature of the trade secrets that Avalara stole, and their incorporation into specific Avalara products. Compl. ¶¶ 14-35. After providing specific detail and context as to the misappropriation, the Complaint states that PTP first had actual notice of the misappropriation in 2017. Compl. ¶ 43. Avalara contends that this is not enough, arguing that, to survive 12(b)(6) scrutiny, PTP also must affirmatively allege negative facts—that PTP would ***not*** have discovered the alleged misappropriation by exercising reasonable diligence. Memo. at 21. But this simply is not the standard.

In an illustrative case, the Federal Circuit analyzed the sufficiency of pleading trade-secret misappropriation and the application of the discovery rule in *ABB Turbo Systems AG v. TurboUSA, Inc.*, 774 F.3d 979 (Fed. Cir. 2014).[1]  There, ABB Turbo alleged that TurboUSA misappropriated its trade secrets for some 26 years, ending in 2012.  774 F.3d at 982-83.  TurboUSA moved to dismiss the trade secret claim because ABB Turbo knew "or by the reasonable exercise of diligence should have discovered" the alleged misappropriation more than three years before filing the complaint.  *Id.* at 983.  The district court granted TurboUSA's motion, finding that the misappropriation "occurred over a long period and through geographically dispersed meetings," which should have given plaintiff "at least . . . an inkling that something was amiss."  *Id.* at 985.

The Federal Circuit reversed, finding that the complaint made it affirmatively plausible that ABB Turbo did not have too-early actual or constructive notice, but the Court noted that even that was more than Rule 12(b)(6) required; under the Rule, it was enough that ABB Turbo had not pleaded facts "making apparent that ABB actually or constructively discovered the alleged misappropriations by June 2009"—in fact, ABB Turbo's complaint made no notice allegation at all.  *Id.* at 985-86.  The court further noted that several courts, including the Seventh Circuit, "have treated comparable [inquiry notice] issues as factual ones not appropriate for resolution at the complaint stage."  *Id.* (citing *Marks v. CDW Computer Ctrs.*, Inc., 122 F.3d 363, 367 (7th Cir. 1997)).

As in *ABB Turbo*, PTP's Complaint alleges specific details of the trade secret misappropriation.  Compl. ¶¶ 27-43.  It alleges that that Avalara terminated the potential business deal with PTP in early 2012, triggering an obligation to return or destroy PTP's confidential information.  Compl. ¶¶ 26, 40; Compl. Ex. 2 ¶ 4.  The Complaint contains no allegation to suggest

---

[1] In *ABB Turbo*, the court analyzed Florida's version of the Uniform Trade Secrets Act, which, like the WUTSA, expressly invokes the discovery rule.  *See* Fla. Stat. § 688.007.

that PTP had constructive knowledge of the misappropriation, and Avalara points to none.  As *ABB Turbo* instructs, the analysis ends there.  Nevertheless, like in *ABB Turbo*, the Complaint contains allegations that affirmatively support that PTP had no constructive notice.  For example, PTP had no reason to investigate potential misappropriation where Avalara was contractually bound to destroy confidential materials.  Compl. ¶ 40; Compl. Ex. 2 ¶ 4.  And, regardless, no allegation (cited by Avalara or otherwise) suggests that the trade secrets were the kind that would readily reveal themselves in the marketplace.  Thus, Avalara has not met its burden under the applicable standard, nor could it.

Moreover, Avalara's cited cases do not support its statute of limitations arguments.  Indeed, two of the cases Avalara cites, Memo. at 19, triggered the statute of limitations from actual notice; in the other, the Seventh Circuit reversed dismissal in consideration of factual issues.  S*ee Kincheloe v. Farmer*, 214 F.2d 604 (7th Cir. 1954) (finding that the statute of limitations began to run on the date of the car accident); *Century Hardware Corp. v. Powernail Co.*, 282 F. Supp. 223 (E.D. Wis. 1968) (finding that plaintiff's cause of action accrued when his dealership agreement was terminated); *Butcher v. United Elec. Coal. Co.*, 174 F.2d 1003 (7th Cir. 1949) (reversing dismissal at the pleadings stage because the plaintiff had been denied the opportunity to raise factual disputes regarding the statute of limitations).

Under the relevant statutes and applicable case law, PTP has properly pleaded that it filed the Complaint within three years after reasonably discovering the misappropriation as required by the WUTSA and the DTSA.[2]  Thus, PTP's trade secret misappropriation claims are not time barred.

---

[2] Avalara's Motion mentions in passing that the DTSA was enacted after the date of Avalara's first alleged misappropriation.  Memo at 20.  Federal courts applying the DTSA have found that the statute is applicable where the trade secret was first misappropriated before enactment and the misappropriation continued after enactment, as is the case here.  *See Vendavo,*

##### 2.   PTP Did Not Grant Avalara Permission To Use Its Confidential Information.

Avalara also introduces a second trade secret argument: that any activity happening after the Confidentiality Agreement allegedly expired on August 1, 2014 cannot be trade secret misappropriation because, Avalara argues, any use of PTP's trade secret information "would be expressly permitted by the Letter Agreement."   Memo. at 21.   Avalara's argument that the Confidentiality Agreement pledged PTP's confidential information to Avalara is absurd.   As discussed above, the Agreement contains an express provision for the return or destruction of PTP's confidential information upon termination of negotiations for Avalara to acquire PTP. Paragraph 4 of the Agreement provides that, should Avalara decide not to acquire PTP, Avalara will either promptly destroy all copies of PTP's information or else return them.   Compl. ¶ 40; Compl. Ex. 2 ¶ 4.   Avalara was required to do so when it told PTP that it was no longer interested in acquiring PTP.   Compl. ¶ 26.   Had Avalara acted in accordance with the Confidentiality Agreement, there would have been no written materials to steal.   Avalara would have returned or destroyed the notes it took during the August 2011 meeting, including those copying PTP's trade secrets from the white board.   *Id.* at ¶¶ 21-22.   It would also have returned or destroyed the "unlocked" release of Pavlou SalesTaxPRO provided by Mr. Pavlou.   *Id.* at ¶¶ 23-24.   And it would have returned or destroyed PTP's plans for growth to other states and for a subscription version that were provided by Mr. Pavlou.   *Id.* at ¶ 25.   Instead, Avalara incorporated the trade secrets contained in these materials into its products in violation of the Confidentiality Agreement. *Id.* at ¶¶ 34-36.   Despite Avalara's suggestion to the contrary, the Confidentiality Agreement was

---

*Inc. v. Price f(x) AG*, No. 17-cv-06930, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018); *Adams Arms, LLC v. Unified Weapon Sys., Inc.*, No. 8:16-cv-1503, 2016 WL 5391394, at *6 (M.D. Fla. Sep. 27, 2016).

drafted to protect PTP's secrets.  When the Agreement is read as a whole, Avalara's argument does not hold water.

Avalara's reliance on *ECT International, Inc. v. Zwerlein*, 597 N.W.2d 479 (Wis. Ct. App. 1999), is misplaced.  Memo. at 21.  *ECT* considered an employment agreement, which provided that Zwerlein "agree[d] not to make use of, nor divulge, [certain confidential] Information to anyone either during or for a period of one year after the termination of my employment."  *Id.* at 484.  The negative pregnant, the Court concluded, was that Zwerlein was permitted to divulge this information after a year.  *See id.* at 485.  Here, by contrast, the Confidentiality Agreement required that Avalara return or destroy certain documents.  Compl. ¶ 40; Compl. Ex. 2, ¶ 4. It did not implicitly suggest that if Avalara failed to do so, then Avalara had free rein to use the information as it pleased.  To the contrary, PTP took reasonable steps to further the protection of its secrets. The Court should not credit Avalara's argument to the contrary.

### E.      The WUTSA Is Not Limited To Conduct Occurring In Wisconsin, And Even If It Were, The Suit Has A Sufficient Connection To The State.

In making its "extraterritorial reach" arguments, Memo. at 22-24, Avalara paints a picture of two parties having little relationship with Wisconsin.  Not only do PTP and Avalara have sufficient connection to Wisconsin, but Avalara's misappropriation occurred and occurs within Wisconsin.  In any event, the WUTSA is not limited to intrastate conduct.

#### 1.      Both PTP And Avalara Have A Sufficient Connection To Wisconsin, And Avalara's Trade Secret Misappropriation Occurs Here.

As Avalara acknowledges, Memo. at 24, both PTP and Avalara have connections to Wisconsin.  PTP, a limited liability company, has two members that reside in Wisconsin. Compl. ¶ 5.  These members have an interest in the dispute.  PTP also has customers who are citizens of Wisconsin.  PTP does business in Wisconsin, providing services and selling its products, which incorporate the claimed trade secrets.  Compl. ¶¶ 35, 53.  Like PTP, Avalara

resides in Wisconsin, specifically in Green Bay, and does business in Wisconsin. Compl. ¶ 6. Among other things, Avalara sells its infringing products, which incorporate PTP's trade secrets, in Wisconsin. Compl. ¶ 53.

Avalara contends, without any support, that these direct connections to Wisconsin are insufficient to retain the protections of the WUTSA. Memo. at 24. Having no argument to make under the WUTSA, Avalara instead turns partly to the DTSA and partly to an unrelated antitrust analysis to argue "extraterritoriality," but Avalara's analogies are to no avail. Memo. at 23-25.

### 2. The DTSA And Wisconsin Antitrust Law Are Not Relevant To Whether The WUTSA Applies, But Nevertheless Support Application Of The WUTSA.

Avalara first analogizes applying the federal DTSA outside the United States with applying the WUTSA as alleged in the Complaint. Memo. at 23. Despite the awkwardness of the analogy, the comparison favors the application of the WUTSA to the alleged facts. By its terms, the DTSA applies where "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837(2). Adopting Avalara's analogy, the WUTSA would apply to "an act in furtherance of" misappropriation occurring in Wisconsin. At least Avalara's infringing sales in Wisconsin are in furtherance of the misappropriation, so the WUTSA should apply. *See* Compl. ¶ 53.

Next, Avalara detours into Wisconsin antitrust law, Memo. at 24, which is not in dispute here. The antitrust "significant and adverse effects" test has not been applied to the WUTSA. Avalara cites no authority suggesting otherwise. The test itself—whether there is a significant and adverse effect on "trade and economic competition" within Wisconsin—is crafted to an antitrust, not a trade secret misappropriation, analysis. Despite its inapplicability to the WUTSA, PTP has pleaded facts supporting significant and adverse effects resulting from Avalara's misappropriation. PTP, which does business in Wisconsin and is partially comprised of Wisconsin members, is directly affected, significantly and adversely, in Wisconsin, by Avalara's misappropriation.

Compl. ¶¶ 5, 53.  More directly, Avalara's active misappropriation of PTP's trade secrets through its undisputed Wisconsin sales of the accused products significantly affects residents of Wisconsin and warrants application of the WUTSA.  Avalara does not argue otherwise, much less does it meet its burden under Rule 12(b)(6).

### F. PTP Properly Pleads Unfair Competition As A Private Cause Of Action And The Claim Should Not Be Dismissed.

Avalara incorrectly argues that Wisconsin does not provide a private right of action for unfair competition.  Memo. at 25.  Wisconsin Statute § 100.20 governs methods of competition and trade practice.  Subsection 5 provides a private right of action for "any order issued under this section," meaning Section 100.20.

Here, PTP is bringing an action under Wisconsin Statute § 100.20(1t), which provides:

> It is an unfair trade practice for a person to provide any service which the person has the ability to withhold that facilitates or promotes an unfair method of competition in business, an unfair trade practice in business, or any other activity which is a violation of this chapter.

Avalara, through the sale of its products, provides a service, which it has the ability to withhold, that facilitates and promotes an unfair method of competition and trade practice in business. Compl. ¶¶ 72-77.  PTP has therefore properly stated a claim for unfair competition under Section 100.20, so it has the right to bring a private cause of action.

Ignoring Wisconsin law to the contrary, Avalara argues that there is no private cause of action under Section 100.20(1t).  According to Avalara, when the statute allows a private cause of action for "any order issued under" Section 100.20, it means a separate order—over and above the legislatively enacted statutes.  Memo. at 26.  But in *Reusch v. Roob*, the Wisconsin Court of Appeals expressly held that there is a "private remedy available" for any person harmed by "unfair competitive or trade practices" under "§ 100.20(1t)."  610 N.W.2d 168, 176-77 (Wis. Ct. App. 2000).

In deciding a question of Wisconsin state law, the decision in *Reusch* by a Wisconsin "state's intermediate appellate court[]"is entitled to "great weight." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). Unless "there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court," this court should not "deviate from [its] holdings." *Id.*

Avalara lacks the necessary "persuasive indication[]" that the Wisconsin Supreme Court would diverge from *Reusch*. Avalara cites the district court's decision in *In re Aftermarket Filters Antitrust Litigation*, which—in one passing paragraph, with no reference to *Reusch*, and with no analysis—assumed that there is no private cause of action in an antitrust case. *Aftermarket Filters*, No. 08 C 4883, 2009 WL 3754041, at *10 (N.D. Ill. Nov. 5, 2009) (citing *Emergency One, Inc. v. Waterous Co.*, 23 F. Supp. 2d 959 (E.D. Wis. 1998)). Avalara also cites *Emergency One* itself, another district court antitrust case. 23 F. Supp. 2d at 972. *Emergency One* emphasized that, at the time, there was "no support . . . in case law" for assuming that there is a private cause of action. *Id.* Since then, however, a Wisconsin court of appeals issued *Reusch*.

At bottom, the question here is one of Wisconsin state law, and, as *Allstate* emphasizes, a decision by a Wisconsin state court is entitled to great weight—respectfully, far more than district court decisions predicting what Wisconsin courts would do. Accordingly, the Court should apply the Wisconsin authority and deny Avalara's request to dismiss the unfair competition count.

## G. PTP's Breach Of Contract Claim Is Not Time-Barred.

Avalara applies California's statute of limitations law to the breach of contract claim, but Wisconsin, not California law should apply. Regardless, under either the Wisconsin or California statute of limitations, PTP's breach of contract claim is not time-barred.

1.     **The Wisconsin Borrowing Statute Does Not Apply Because This Is Not A "Foreign Cause Of Action."**

To invoke California law, Avalara relies on Wisconsin's borrowing statute, which applies "foreign" statutes of limitations to some "foreign causes of action." Wis. Stat. § 893.07. This case, however, does not involve a "foreign cause of action."

"[T]he Wisconsin statute asks one question: did the injury occur inside Wisconsin." *Faigin v. Doubleday Dell Pub. Grp., Inc.*, 98 F.3d 268, 272 (7th Cir. 1996). If it did, then the "borrowing statute" does not apply. *Id.* Even "some business," amounting to "less than two-tenths of one percent" of the sales of a defamatory book, takes a transaction outside the "foreign cause of action." *Id.* at 269. Here, Avalara's sales, including in Wisconsin, have injured PTP. The injury occurred in Wisconsin, where certain of PTP's members reside. Compl. ¶ 5. This is "*some* injury (even if negligible) in Wisconsin for the action to be deemed non-foreign." *Studio & Partners, s.r.l. v. KI*, No. 06-C-628, 2007 WL 3342597, at *3 (E.D. Wis. Nov. 7, 2007) (emphasis original) (Griesbach, J.). [3]

Avalara's reference to the choice of law provision in the Confidentiality Agreement does not change the analysis. "In general when parties include a provision in their contract as to the governing law, the courts consider that the provision applies only to the substantive law and is not to be deemed to govern the statute of limitations." *Office Supply Co., Inc. v. Basic/Four Corp.*, 538 F. Supp. 776, 781 (E.D. Wis. 1982).

Where there is no foreign cause of action, the borrowing statute does not apply; Wisconsin's six-year statute of limitations therefore applies. Under it, PTP's breach of contract claim is timely.

---

[3] The cases Avalara cites are unhelpful. In *Abraham*, Memo. at 27, the court found no foreign cause of action where injury occurred in Wisconsin. *Paynter*, *id.* sounds in tort, not contract law.

### 2. Even If California Law Applies, The Discovery Rule Tolls Running Of The Statute Of Limitations.

Even if California law were to apply, PTP's breach-of-contract claim survives.  California law provides for a four-year statute of limitations on breach of contract claims.  Cal. Civ. Pro. Code § 337.  Running of the statute is tolled until the "plaintiff knew or should have known of the wrongful conduct at issue."  *Gryczman v. 4500 Pico Partners, Ltd.*, 131 Cal. Rptr. 2d 680, 683 (Cal. Ct. App. 2003); *see El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003) ("the discovery rule ameliorates the harshness of the general rule 'in some cases . . . where it is manifestly unjust to deprive plaintiffs of a cause of action before they are aware that they have been injured'"); *Luck v. OTX Acquisition Corp.*, No. CV 10-1671, 2010 WL 11595817, at *13 (C.D. Cal. Aug. 3, 2010) ("under California law, the discovery rule may toll the accrual of a cause of action for breach of contract").  As discussed in Section III.D above, PTP has adequately pleaded its allegations relating to discovery of Avalara's breach, and PTP's breach of contract claim is timely under California's four-year statute of limitations.

The cases Avalara cites in support of its argument, Memo. at 28, are inapposite.  In *MCA Records, Inc. v. Allison*, MCA Records affirmatively "welcomed" Allison to inspect its books to verify that MCA Records had been paying proper royalties.  No. B199801, 2009 WL 1565037, at *4 (Cal. Ct. App. June 5, 2009) (unpublished).  The court concluded that it was Allison's own fault for turning down the offer, so the statute of limitations would not be tolled.  *Id.* at *10-15.  Here, by contrast, PTP had no reason to believe that it needed to verify whether Avalara was stealing its trade secrets, and it certainly had no offer to look into Avalara's product.  Likewise, in *Sanchez v. Compania Mexicana de Aviacion S.A.*, the Court concluded that an aggrieved passenger "reasonably could have discovered" a charge that was "listed as a separate item on her ticket."  361

F. App'x 751, 752 (9th Cir. 2010).  Nothing like that exists here.  The breaches in *Tin* and *Cochran* were likewise readily apparent.

> **3.**     **PTP Adequately Pleaded Facts Showing That Breach Of The Confidentiality Agreement Occurred During Its Three-Year Term And The Claim Is Within The Statute Of Limitations.**

Avalara's final argument is that PTP pleads no facts to support breach of the Confidentiality Agreement after October 22, 2014.  Memo. at 28.  Avalara's argument is premised on two incorrect premises: (1) that the California statute of limitations applies and (2) that, under California law, the action is barred.  As shown above, both are wrong, but even under California law PTP's claim survives.  Avalara's argument that the Confidentiality Agreement permitted Avalara to use PTP's secrets fails for the reasons discussed in Section III.D.2 above.

## IV.     CONCLUSION

For the reasons stated above, Avalara's motion to dismiss should be denied.

Dated: November 28, 2018                        By: *s/ Jonathan T. Smies*
                                                                    Jonathan T. Smies
                                                                    State Bar No. 1045422
                                                                    GODFREY & KAHN, S.C.
                                                                    200 S. Washington Street, Suite 100
                                                                    Green Bay, WI 54301-4298
                                                                    Phone:  (920) 436-7667
                                                                    Fax:  (920) 432-9300
                                                                    Email:  jsmies@gklaw.com

                                                                    *Of Counsel:*

                                                                    William E. Devitt
                                                                    Timothy J. Heverin
                                                                    Collin J. Kurtenbach
                                                                    JONES DAY
                                                                    77 W. Wacker, Ste. 3500
                                                                    Chicago, IL 60601-1692
                                                                    Phone:  (312) 782-3939

                                                                    *Attorneys for Plaintiff PTP OneClick, LLC*

29

## CERTIFICATE OF SERVICE

I certify that on November 28, 2018, a copy of the foregoing was filed electronically with the Clerk of Court using the ECF system.  A copy of this filing will be served on Defendant by operation of the Court's ECF system.

Dated: November 28, 2018

_s/ Jonathan T. Smies_____